## STALLMAN v. FRANCIS A. CUNDILL & CO.

(District Court, S. D. New York.   May 29, 1922.)     **s**

1. **Sales ⟨⟩81(3)—Provision in contract "shipment to be made promptly" held equivalent to "prompt shipment."**

A provision in a contract of sale, "shipment to be made promptly," *held* equivalent to "prompt shipment," having a definite meaning by the custom of the trade.

2. **Sales ⟨⟩161—Delivery by seller held to comply with contract.**

Defendant sold to plaintiff a quantity of camphor for prompt shipment from New York to London. Within the time shipment was required to be made by the custom of the port defendant called up a shipping company, and, being told that it had a ship in port loading, delivered the shipment at the designated pier, receiving a so-called bill of lading, reciting receipt of the goods for shipment by the vessel named. In fact, such vessel was not in port, and did not arrive for some time thereafter; but that fact was not known by defendant. *Held* that, under the custom of the port of New York, which governed, such delivery and receipt was shipment in compliance with the contract, and that defendant was justified in accepting the word of the carrier that the ship was then at dock, without verification.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

At Law. Action by John H. Z. Stallman against Francis A. Cundill & Co., copartners. Judgment for defendant.

Hunt, Hill & Betts, of New York City, for plaintiff.
Blackwell Bros., of New York City, for defendant.

LEARNED HAND, District Judge. This is an action at law tried before a jury of one on an agreed statement of facts. The complaint is for damages for failure to deliver a consignment of 30 cases of camphor to be shipped from New York to London to the plaintiff. The sale was made by broker's usual bought and sold notes, of which the sold note recited that there had been sold for the account of the defendant to the plaintiff in London 30 cases of Japanese camphor c. i. f. London, 18 shillings and 6 pence a pound, including war risk insurance, "shipment to be made promptly by steamer from New York to London." The terms were, as usual, a draft against bill of lading.

[1] The bought and sold notes were exchanged on December 5th, and the agreed statement of facts admits that the phrase "prompt shipment," by the custom at the port of New York, meant 14 days from the contract date. The defendant urges, though in my judgment without great conviction, that the phrase, "shipment to be made promptly," is not the equivalent of "prompt shipment." I cannot agree with this contention. I take it that there is nothing mystic or ritualistic about the phrase "prompt shipment." It is used by practical men of affairs to indicate an immediate shipment, or shipment at once, and the phrase "shipment to be made promptly" has a meaning which is its exact equivalent. I therefore hold that the defendants were bound to ship on or before the 19th of December, 1919.

[2] Now what they did in fact was this: At the time in the port of New York a corporation, Christoffer Hannevig, Inc., was acting as agent for another corporation of the name of Nova Scotia Transportation Company, Limited, probably another name for the same parties as the agents themselves. On December 16th the defendant called up the office of Christoffer Hannevig, Inc., and asked whether they could carry the parcel of goods in question, which at that time were in the port of New York. Christoffer Hannevig, Inc., informed the defendant that the steamship Fire Island was at that time in New York loading cargo, and told the defendants to deliver the cases of camphor at Pier 32, East River.

This the defendants did on December 18th, and at that time obtained a document which in the port of New York goes by the name of a "bill of lading." It is not in fact a true bill of lading at all, as was observed with great accuracy by Brown, J., in The Caroline Miller (D. C.) 53 Fed. 136. A bill of lading, as Brown, J., there says, is a document signed by the master and acknowledging the receipt of goods on board a specified vessel. If true, it actually binds the vessel by creating a maritime lien between her and the goods. But in the port of New York there has apparently for a long time been a custom to call and treat as bills of lading documents of a different character. These acknowledge the receipt from the shipper of the goods in question, which are "to be transported" or "for shipment" by a given ves-

sel from the port of New York to the port of destination. The bill of lading in question read as follows:

"Received in apparent good order and condition from Francis A. Cundill & Co., for shipment by the vessel Fire Island from port of New York and bound for London."

It will be noticed that this document did not acknowledge the receipt of the goods on board the Fire Island, nor were they ever so delivered. On the contrary, they were delivered upon the dock, Pier 32, in the custody of Christoffer Hannevig, Inc., who promised by the so-called bill of lading to ship them in accordance with the requirements of the sold note. The bill of lading also contained the following language:

"The carrier may substitute or transport on any other or succeeding steamer."

The plaintiff argues that the bill of lading was not a sufficient compliance with the contract. First, they insist that the right of substitution was improper, as it did not bind the carrier to ship by the Fire Island, but, on the other hand, gave him free leave to substitute any later steamer as he might choose. Many bills of lading have been offered in evidence to show what the practice in the port of New York is touching this matter, and all of them are in substance precisely like the bill of lading at bar. In no case do they acknowledge the receipt on board the steamer in question; they all read that the goods are to be "transported by the steamer," and in all cases they have the equivalent of the substitution clause in Christoffer Hannevig, Inc.'s bill of lading. For example, the most common phrase is as follows:

"Failing shipment by said steamer, in and upon a following steamer."

It seems to me that the defendant has complied with that stipulation of the contract which requires prompt shipment. I regard the word "shipment," when used in such a contract at the present time and for delivery in the port of New York, as subject to the custom of that port, and to require no more than delivery to a carrier in good standing, receiving from him one of the so-called bills of lading which have been put in evidence here, and of which the bill of lading in question is a fair example.

To this I think, however, there should be one qualification made. Obviously a bill of lading by a steamer which the shipper knew was not at that time in the port would not be an honest compliance with the contract for prompt shipment. I go further, and, indeed, I do not understand that the defendant disputes this proposition: At the time of taking such bill of lading from a carrier, the shipper must be reasonably assured that the ship is ready to receive the goods either at once or within a reasonable time, which should be measured only by a few days. Therefore, if the defendant had in fact supposed that the Fire Island, which was supposed to lift this camphor, was at Newfoundland, where she was, I do not think the bill of lading would have been "prompt shipment." Christoffer Hannevig, Inc., grossly misrepresented the whereabouts of the ship. She was not then loading at

Pier 32. She had not even reached the port of New York and was 1,000 miles away. And so the question comes up whether the defendant has shown performance of the contract in accepting the word of the carrier and not making any independent investigation himself.

Under the stipulated facts it is agreed that the actual whereabouts of the Fire Island could have been ascertained from the Maritime Register and other means available in the port of New York. Had these been examined, the defendant would have not only known that she was not loading, but that she would not have reached the port for a matter of four or five days presumably. Therefore, as I view the case, and as I understand both parties view it, the question depends on whether the defendant was entitled to take the assurance of the carrier, without more, as to the whereabouts of the ship.

That is, perhaps, an arguable matter; but in view of all the circumstances I am disposed to hold that the assurance which the defendant accepted was reasonable. Of course, the carrier must have known where his own ship was; there was, then, no carelessness in supposing that he was informed. The only possible negligence was in not suspecting that he might deliberately misstate the fact. That seems to me such gross and unexpected misconduct that I do not feel disposed to charge the defendant with failing to suspect it. The cargo was not of very great value, probably not more than $8,000 or $9,000. To require a shipper, having received the assurance of the carrier himself that the ship was then at dock, to suspect that assurance and independently to verify it, even though the verification was not difficult, would impose a standard of incredulity between men of affairs dealing in the port which I am glad to say I think unwarranted.

I will not, therefore, charge the defendant with negligence in accepting the word of the carrier. That being true, the contract was performed in accordance with the custom of the port. It follows that the plaintiff was obliged to accept the camphor on its arrival, and had recourse only against the carrier for his deceit against the shipper, to which, no doubt, if it had any value, the plaintiff would be substituted along with the transfer of the goods.

I therefore direct a verdict for the defendant, and the clerk will so record it.